LOGAN v. SIMPSON et al.

(Supreme Court, Appellate Division, First Department. April 29, 1901.)

CORPORATIONS—CONSOLIDATION—POOL—PROFITS OF CONSOLIDATION—DIVISION—
MODE OF COMPUTATION.

Plaintiff and defendants entered into a pool for the purpose of effecting a consolidation of gas companies, and plaintiff subscribed $650,000 to the pool, to which $15,000,000 was the total subscription; and it was agreed that the profits should be divided in proportion to the various subscriptions. Plaintiff agreed to turn over his stock in one gas company, which was supposed to be of the value of $650,000, and he transferred it to the pool, but received over $333,000 in cash therefor. The pool only paid $8,700,000 for the total stock purchased, and the amount of stock actually contributed by plaintiff without receiving payment therefor only amounted to something over $300,000. Held, that plaintiff was not entitled to share in the profits in that proportion of the entire profits which $650,000 bore to the $8,700,000 actually expended, but was bound by the consolidation agreement, which entitled him to such share only as the $650,000 bore to $15,000,000.

Appeal from special term, New York county.

Action by William J. Logan against John W. Simpson and others, as executors of John G. Moore, deceased, and others. From a judgment in favor of certain defendants, plaintiff and defendant Benedict appeal. Affirmed.

Argued before VAN BRUNT, P. J., and RUMSEY, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

Wm. B. Hornblower, for appellant Logan.
John L. Hill, for appellant Benedict.
Thomas Thacher, for respondents Simpson and others.

INGRAHAM, J. There are three distinct issues presented by the pleadings in this action. The first arises upon a cause of action against the defendants other than the defendant Benedict, the second upon a counterclaim set up in the answer of the defendant Benedict against the plaintiff, and the third upon a cause of action which the defendant Benedict asks to enforce against the co-defendants. The issues were referred to a referee, who directed judgment dismissing the complaint as against all of the defendants, dismissing on the merits the cause of action which the defendant Benedict sought to enforce against his co-defendants, and also dismissing the counterclaim of the defendant Benedict against the plaintiff. From this judgment the plaintiff appeals, so far as the judgment dismisses his cause of action against the defendants other than Benedict, and the defendant Benedict appeals from so much of the judgment as dismisses his counterclaim as against the plaintiff and as against his co-defendants.

The cause of action which the plaintiff sought to enforce was based upon an alleged agreement between the plaintiff and the defendant Rogers, under which the plaintiff transferred to the firm of Moore & Schley 7,202 shares of the capital stock of the Williamsburg Gaslight Company, a corporation engaged in the manufacture and supply of gas for illuminating purposes in the city of Brooklyn. Of this 7,202 shares of capital stock, 500 belonged to the defendant Benedict, and 1,500 shares had been purchased by Benedict under an agreement whereby the profits to be realized upon the purchase were to be divided between Benedict, Sheldon, and the plaintiff. Benedict, however, had paid for these 1,500 shares, and the same were in his possession. It seems that there had been considerable discussion as to the union of the various gas companies in Brooklyn, and several unsuccessful attempts had been made to consummate such a union. The defendants Rogers and Rockefeller and the firm of Moore & Schley had been engaged in purchasing stock of the Brooklyn gas companies for the purpose of effecting such a consolidation; and the plaintiff, with the aid of some of his friends, had also purchased or controlled 7,202 shares of the stock of the Williamsburg Company, each of which was of the bar value of $50,—the control of the Williamsburg Company being necessary to effect the consolidation of the Brooklyn gas companies. The plaintiff had several interviews with the defendant Rogers between the 4th and 10th of December, 1894. His version of the most important of these interviews was that Rogers stated that a syndicate of fifteen millions was contemplated, but said: "We have no definite plan. If you get as good as I get, ought that to satisfy you?" The plaintiff replied: "If I get bed rock on it,—if I get as good as you will get,—that will satisfy me,"—and that he went to consult with his associates, and agreed to meet Rogers on the following night, with a definite answer to the proposition. At the following interview the plaintiff accepted Rogers' proposition, and Rogers

then referred him to the firm of Moore & Schley, who were the brokers for the parties, and had charge of the details of the arrangement. On a subsequent day Rogers took the plaintiff to the office of Moore & Schley, and introduced him to Mr. Moore, a member of the firm. No agreement was arrived at on that day, but at a subsequent interview with Moore he stated that the plaintiff was to be one of the syndicate, and, after stating the number of shares of the stock that the plaintiff controlled, Moore said: "That would give you $600,000 in the syndicate." To which the plaintiff replied: "Well, if that embodies the agreement with Rogers, that is all right. You understand what my agreement is with him? I am to get what he gets for his Williamsburg stock." To which Moore replied: "Well, that is the way I figure it. You are entitled to $600,000 on that,—175 for your stock [which is at the rate of $87.50 per share]; and 6,702 shares would be about $600,000. That gives you $600,000." To which the plaintiff replied: "All right. If that embodies the agreement as Mr. Rogers explained, it is satisfactory to me." And the agreement, as finally consummated, was that the plaintiff was to have the $600,-000 in the syndicate, and that the shares of stock held by outside parties for the plaintiff were to be sent to Moore & Schley; they to pay such outside parties the amount of money that the plaintiff owed upon the stock. Subsequently, when the plaintiff arranged that the 500 shares of stock owned by Benedict should be included, in addition to the other stock that had been sent in, it was agreed that his interest in the syndicate should be raised to $650,000; and the plaintiff testified that he was ultimately credited on his account with Moore & Schley for the stock turned in by him at 210. Subsequently the plaintiff was told that there was a syndicate agreement at the office of their attorneys, and that he was requested to sign it. The plaintiff at first refused to sign this agreement, until after he had an interview with Rogers. At this interview the plaintiff said to Rogers: "I would not sign unless it left our original agreement unchanged." To which Rogers replied: "It is all right. Go over and sign it." This agreement was dated March 6, 1895, and recited that the subscribers "propose to raise a fund of $15,000,000, to be expended by and under the control of the committee, to bring about such union in such manner and to such extent as the members of the committee, or a majority of them, may determine." And the agreement witnessed "that the subscribers have severally subscribed to the said fund the sums written opposite their names, respectively, at the foot of this agreement, and, each for himself only, have promised and agreed" to pay the said sums to the committee in such installments and at such time or times as the committee may determine. The subscribers authorized the committee, which consisted of Rogers, Moore, and Campbell, to use and expend the money so subscribed in acquiring, by purchase or otherwise, the stocks, bonds, or other obligations of any incorporated company engaged in the business of manufacturing, supplying, or distributing gas in the city of Brooklyn, Kings county, N. Y., or in the payment of such expenses as were authorized. The stocks so purchased, and also the stocks for which they may be exchanged, or into which they may be converted, were to be transferred to the commit-

tee; and certificates representing the same were to be deposited with a trustee, subject to the agreement. The consolidation was to be consummated in a manner prescribed in the agreement, and, when the committee should have perfected such union, "it shall distribute or cause to be distributed to and among the subscribers, in proportion to their respective payments, on surrender of their respective certificates of interest, duly indorsed, all bonds, stocks, cash, and other property which, after payment of all expenses hereinbefore authorized, including their own compensation, and compensation to the trustee, shall remain in the hands of the committee." This agreement was signed by Rockefeller, he subscribing $7,500,000, Rogers $3,000,000, Moore & Schley $2,700,000, and the plaintiff $650,000; there being other subscriptions, in smaller amounts, and the total amount that appears to have been subscribed aggregating $15,000,000. Under this agreement the committee proceeded with the consolidation, which seems to have been effected by the organization of a new company, called the Brooklyn Union Gas Company, and received from that corporation for the transfer to it of the stock of the various companies included in the consolidation which had been accumulated by the syndicate, and which included the stock turned in by the plaintiff, bonds of the Brooklyn Union Gas Company amounting to $5,816,069.09, and stock of the Brooklyn Union Gas Company of the par value of $8,710,761.47. The amount paid for such stock by the committee, including the amount allowed to the committee for their services, aggregated $8,725,804.01. The committee then made a distribution among the members of the syndicate based upon an aggregate subscription of $15,000,000, of which the plaintiff's interest was 4⅓ per cent., based upon his subscription of $650,000. Upon this distribution there was awarded to the plaintiff bonds of the Brooklyn Union Company of the par value of $252,029.66, and stock of the said company of the par value of $377,466.33, which was subject, however, to a charge for the proportionate cost of the securities of $378,118.17. It is not disputed by the plaintiff but that this would have been the amount of securities to which he would have been entitled under the so-called syndicate agreement; but he claims that the amount allotted to them is considerably less in proportion than that received by Rogers and Rockefeller, in proportion to the stock actually turned in by them. That is, if the plaintiff was to receive for the stock that he turned in the same percentage that Rogers and Rockefeller received for their stock, he would be entitled to a much larger amount; and it is to recover for this larger amount that the plaintiff brings this action. The whole basis of the plaintiff's claim, therefore, rests upon the correctness of his testimony as to his agreement with Rogers, and the subsequent understanding that the execution of the syndicate agreement was not to affect the original contract, by which the plaintiff was to have the same interest in proportion to the stock that he contributed that Rogers had as to his. Rogers' testimony as to this interview with the plaintiff differed considerably from that of the plaintiff. Rogers testified that he told the plaintiff that Moore & Schley, William Rockefeller, and himself had made a pool into which they were putting all of the stocks of the Brooklyn Gaslight Company that they could pur-

chase; that they contemplated, later on, to bring about a consolida-
tion of gas companies, if it were possible; that the plan was to dis-
pose of the stock, or sell them to the pool, and, later, when the prop-
erties were brought out, either to get up a syndicate or an underwrit-
ing agreement, to which the members of the pool should have the first
opportunity of subscribing. There was then some talk about the
price of the Williamsburg stock, and Rogers said that the price at
which the stock was to go into the pool was 175. Rogers' understand-
ing of the agreement was that Logan "was to sell his stock at 175 a
share to the pool. Further than that, there was an allowance to be
made to Mr. Sheldon of $25,000. Possibly some of the stock that Mr.
Logan put in would have cost more than 175, and that was to be taken
up and fairly considered by Mr. Moore. Further than that, in consid-
eration of his doing that, and in order to put him on an equality with
me, he was to have a subscription in the syndicate that might be form-
ed, or the underwriting agreement, as it was determined at a later
time." Rogers further testified that subsequently, in October, 1895,
the plaintiff came to him and said that he had looked over the syndi-
cate agreement; that he considered that the agreement gave most
unwarranted liberties to the committee; and the plaintiff wanted to
see Rogers before he signed the paper, and asked what to do. To this
Rogers replied, "Is it the paper that Rockefeller and I have signed?"
The plaintiff said, "Yes," and then Rogers said, "You should sign it."

So far as there is a conflict of testimony of the plaintiff and Rogers
as to the actual arrangement between them, the referee found in fa-
vor of Rogers; and, on the evidence, we would not be justified in in-
terfering with his finding. Upon the plaintiff's appeal, his right un-
der this agreement must be determined by the agreement as testified
to by Rogers; but, taking the whole testimony together, it was un-
doubtedly the understanding that the stock controlled by the plaintiff
was to be contributed by him to this syndicate upon the same terms
as the stock contributed by Rogers and his associates. The plaintiff
was told that Rogers and his associates were to put the Williamsburg
stock in the pool at 175; and, while the plaintiff refused to sell his
stock at that price, he undoubtedly acquiesced in the proposition that
it was to be turned into the pool at that price, and in addition any
excess of cost that he had paid for the stock, and he was to obtain
an interest in the subsequent syndicate agreement. Plaintiff under-
stood at his first interview with Moore that his interest in that syn-
dicate was fixed. He certainly did not expect to have the same in-
terest in this syndicate that Rogers and his associates had, as he does
not pretend that he had the financial ability to subscribe for any such
amount. It would seem from the whole testimony that when the
original agreement was made there was not a clear understanding as
to the form of the syndicate agreement, but it was clearly understood
by all that the plaintiff was to have as his share of the profits the pro-
portion that $650,000 bore to $15,000,000. The plaintiff seeks to sub-
ordinate all agreements to the original understanding that he had
with Rogers, making his version of that understanding the agreement
under which the parties were to act, and leaving out of view the agree-
ments that were made to carry that original understanding into effect.

That the understanding with Rogers was that the plaintiff should join in the syndicate agreement upon the same terms that Rogers received, was conceded. The question was, then, how that understanding was to be carried out. The details were to be agreed upon between Moore and the plaintiff. In settling the terms of this agreement between the plaintiff and Moore, neither party was acting as trustee for the other. Both were negotiating at arms' length, each wishing to make the best bargain that he could. The result of the agreement finally arrived at was that the plaintiff was to turn in the stock to Moore, and receive for it 175, and in addition to that he was to receive whatever the stock had cost him in excess of 175 and the $25,000 to be paid to Sheldon. This would seem to have been done, and the plaintiff either paid or credited with the $25,000 and the amount of the stock turned in at the price agreed. In addition to that, the plaintiff was to have an interest in the syndicate agreement, and the amount of that interest was fixed at the original interview with Moore. The plaintiff had been informed that the total amount of the syndicate was to be $15,000,000, and it was expressly understood that of that $15,000,000 he was to be given $650,000; and it was from the profit of that syndicate agreement that he expected to realize the profit over and above the amount that he had actually paid for the stock. When this syndicate agreement was prepared, the plaintiff was given in it just the interest that it had been agreed he should be given, and he accepted that as his proportion. He did not object to signing this syndicate agreement, according to his own testimony, because his share was not sufficient, but because the agreement gave such power to the committee. There was no breach of trust or fraud in relation to this syndicate agreement alleged. Under it, the parties who signed it agreed to contribute a certain amount in cash, which would be used in the purchase of stock of the constituent companies necessary to effect the consolidation; and the proportion which, under that agreement, they were liable to be called on to contribute, was the amount specified by them for that purpose. As a matter of fact, the transaction was carried out without calling on any of the parties to the syndicate agreement to subscribe, the stock having been purchased by Moore & Schley, who advanced the money for that purpose; but if the consolidation had not gone through, or if there had been any loss in the purchase of these securities, there could be no doubt but that each party to that agreement would have been liable for his proportion of the amount that had been used to purchase these securities, and that liability would have been proportionate to the amount which each party to it subscribed. The plaintiff's liability, therefore, was limited to the proportion that $650,000 bore to $15,000,000, and it was clearly the intention of the parties to that agreement that the profits were to be distributed in the same proportion. It must be borne in mind that the syndicate or pool, or whatever it may be called, had paid for the stock which had been purchased by the various members of the pool, and that all there was in addition to be distributed among the subscribers to the syndicate agreement was the profits realized from the consolidation. From this pool the plaintiff had got the amount he had paid for the stock, and while it is true that his propor-

tion of the amount which had been paid in the purchase of the stock, as well as other stock bought by other members of the pool or the public, would have to be paid for by the securities received from the consolidation company, such a payment was a mere substitute for calling on the parties to the syndicate agreement to advance the money which was used for the payment of that stock. The transaction was thus completed without requiring the members of the syndicate agreement to pay the amount necessary to carry the transaction through, but they were required to make such a payment upon the final distribution of their shares in the company. This would seem to have been just what was comtemplated by the agreements between the plaintiff and Moore, and finally consummated by the execution of the syndicate agreements; and while it may be true that because the amount awarded the plaintiff as his subscription to the syndicate agreement was smaller than that awarded to Rogers, which would entitle him to a smaller amount of the profits than Rogers received, the plaintiff never claimed that his share was not sufficient, or that he should receive a larger share than he actually got. So far as appears, he got just exactly what Rogers got; that is, he received the same or more than Rogers received for the stock which was turned into the pool, and he received his share of the profits of the syndicate, which is just what it was understood he was to receive. There is certainly nothing to show that any of the defendants acting under the agreements which were actually made violated any trust obligation or duty owing by them to the plaintiff.

The plaintiff insists that he would have been better off if he had not gone into the agreement with Rogers, but had stayed on the outside, and been paid for his stock at the rate which the outside holders of the stock were paid, and that he is entitled upon this settlement either to receive that amount for his stock, or be paid for it in the proportion which his interest of $650,000 bears to the sum of $8,700,000, the amount actually contributed by the syndicate. His claim is that he paid into the pool 7,202 shares of stock, the value of which was fixed at $650,000, and was to receive $4\frac{1}{2}$ per cent. of the proceeds, upon the understanding that the total amount to be contributed was to be fifteen millions, and that, as the total amount contributed was only eight million and some hundreds of thousands of dollars, he should receive the proportion which 650,000 bears to the amount actually contributed, instead of the proportion which that sum bears to the fifteen millions; the result being that, instead of receiving $4\frac{1}{2}$ per cent. of the profits, he ought to receive something over 8 per cent. The trouble with the plaintiff's claim is that he claims the right to be credited with the full amount of his subscription of $650,000 against this $15,000,000 fund, when, as a matter of fact, he did not contribute any such sum. It is quite true that he delivered to the pool 7,202 shares of stock, and received therefor 175 per cent., or $87.50 a share, and that he was allowed the difference between 175 and 210, which was the rate at which some of his stock was purchased; but, in addition to that, it appears that he received a very considerable sum of money for his stock, which he does not propose to credit. It appears that there was actually paid by the syndicate up-

on the stock turned in by the plaintiff the sum of $333,602.65, as it was turned in. There was afterwards paid to Logan, to enable him to settle for some other stock, $85,260.20; and there was subsequently paid to him $14,210 and $805.08, to enable him to make up the difference between 175 and the actual rate paid for some other stock. The error of the plaintiff lies in his insistence that the sum of $650,000 shall be stated as the actual amount of his contribution, under all circumstances, whereas it was simply the proportion which he was bound to contribute if called upon; the total amount to be contributed being $15,000,000. That amount was fixed upon as the amount which could be called for to enable the parties to purchase the stock necessary to carry out the consolidation, and the profits were to be shared according to the proportion that each party to the agreement agreed to contribute. The court cannot give the plaintiff the relief he asks without overriding the express agreements which the parties had made, and under which the plaintiff was to get the amount he had paid for the stock contributed by him, and his percentage in the profits of the syndicate; and this he has received. I can see no basis upon which the plaintiff is entitled to any larger proportion of the stock or bonds of the consolidated company than that awarded to him by the committee who had charge of the distribution, which was the proportion expressly provided for by the syndicate agreement.

But little need be said in disposing of the two causes of action sought to be enforced by the defendant Benedict. It is apparent that Benedict understood that the plaintiff was to deposit his stock with the syndicate in his own name, and that he (Benedict) was to receive for the 1,500 shares one-third of the profits, and for the 500 shares all of the profits; but the relation that Benedict bore to the transaction was never explained to the other defendants. They treated the stock contributed by him as a part of the plaintiff's stock contributed under the agreement with the plaintiff, and this, it is quite clear, they had a perfect right to do. There is not a particle of evidence to justify a finding that Benedict had any agreement with the syndicate, or that the syndicate had any information that the plaintiff had not full authority to deal in this stock. Benedict himself testified that the letter of December 12, 1894, from Sheldon to himself, correctly stated the agreement which was made between himself and Sheldon, under which his stock, or his interest in this stock, was deposited. That letter stated that the agreement between the plaintiff and Moore was that "we" were to take a position in favor of consolidation, and be willing to have "our" stock go in on the same basis that Rogers' did; "in other words, that we should have the same right, according to the number of shares that we owned, to subscribe in the syndicate to carry through the consolidation enterprise that Mr. Rogers had upon the stock that he owned. This was the proposition that Mr. Logan stood on generally, and Mr. Rogers has acceded to it. Supposing that Mr. Logan's stock amounts to 6,000 shares, as it does, exclusive of your 500 or $300,000 par value at 200 on the stock, it would amount to $600,000; and I understand that Mr. Logan has the privilege and does subscribe for $600,000 interest in the underwriting syndicate. He has also re-

served the right, as I told Fred, so that you can put your stock in exactly on the same basis that he put his in, so that, if you think well of it, send your stock in to them, and receive 175 now on it in ·cash, and Mr. Logan will be entitled to receive $50,000 additional subscription in the underwriting syndicate to cover your 500 shares. It is part of the agreement that Mr. Logan shall act personally for all the parties that deal through him, and that whatever account is made up between Mr. Rogers and Mr. Logan, which shall be satisfactory to Mr. Logan, shall be also accepted as such by the parties for whom Mr. Logan deals." This was the agreement that Mr. Benedict understood Mr. Logan had made on his behalf, and it was this agreement that was carried out by the syndicate. Mr. Benedict put in his additional 500 shares. Logan subscribed in the syndicate for a $650,000 interest in it, and it is the interest based on this subscription which has been allowed him by the syndicate, but which he now repudiates and refuses to accept. Thus, Benedict sent in his stock to Moore & Schley upon the understanding that he was to be paid $175 for the stock, and that Logan was to be allowed to subscribe for $50,000 additional interest in the syndicate agreement. As between Benedict and Logan, Benedict was to receive all of the profits upon the 500-share subscription, and one-third of the profits upon the 1,500-share subscription; and it is just this agreement that has been carried out, and the profits upon that agreement have been awarded to Logan, but he refuses to accept them.

It follows that the disposition of the case by the learned referee was correct, and the judgment should be affirmed, with costs. All ·concur.

RUMSEY, J. (concurring). While I concur fully in the opinion of Mr. Justice INGRAHAM in this case, I cannot resist referring to certain facts which I think completely answer the claim of the plaintiff, upon his own theory of the case. His claim is, as I understand it, that he is not bound by the syndicate agreement, and that his rights are not to be tested by what is contained therein. In that claim I do not at all concur, but, if it be allowed, I do not think that it betters his condition. By the syndicate agreement he was entitled to share in the proceeds of the transaction in the proportion which $650,000 bears to $15,000,000. If the amount actually contributed furnishes the basis of the division, his share, of course, would be the proportion which the amount of his actual contribution bears to the sum of $8,700,000, which is the amount of the cost and expense of the transaction. That actual contribution was not $650,000, but considerably less. The stocks which he deposited with the syndicate, if figured at a price of 175, amount to something over $630,000. Adding to that the amount allowed to him because some of the stocks had cost him more than 175, and the full amount of his contribution is about $650,000. But for those stocks the syndicate was actually called upon to pay out all the money which the plaintiff owed upon them, and a large sum to Benedict, and in addition about $15,000 to make the plaintiff good for the excess over 175 paid by him on some of the stock, and $25,000

to pay Sheldon for his commissions. The whole amount of those payments was nearly $460,000; and to ascertain, therefore, the actual amount of the plaintiff's contribution, those payments must be deducted from the sum of $650,000, which was the price of his stock. If that be done, it will be seen that his actual contribution was only about $200,000. So, if the syndicate agreement is to be abandoned, and the amount received by the pool is to be distributed in strict proportion to the actual instead of the estimated amount of the contributions, the plaintiff's share, instead of being the proportion which $650,000 bears to $15,000,000, would be that which $200,000 bears to $8,700,000.